Estate of G. A. Buder, Deceased, G. A. Buder, Jr., Executor v. Commissioner.
Estate of Buder v. Commissioner
Docket Nos. 77659 and 77660.
United States Tax Court
T.C. Memo 1963-73; 1963 Tax Ct. Memo LEXIS 272; 22 T.C.M. (CCH) 300; T.C.M. (RIA) 63073; March 13, 1963
Richard O. Roberts, Esq., Buder Bldg., St. Louis, Mo., and G. A. Buder, Jr., for the petitioner. Robert A. Roberts, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in income tax of G. A. Buder, deceased, for the years 1952, 1953, and the period January 1, 1954, to April 14, 1954, and deficiencies in the income tax of the estate of G. A. Buder, deceased, for the period April 15, 1954, to December 31, 1954, and the year 1955 in the respective amounts of $14,011.05, $65,883.93, *274 $12,807.95, $27,410.38, and $65,326.54. The issues for decision are: (1) Whether expenditures in each of the years or periods here involved by decedent G. A. Buder or his estate for litigation expenses relating to a lawsuit brought by Oscar E. Buder against G. A. Buder are deductible. (2) Whether a legal fee of $4,250 paid by G. A. Buder in 1952 in connection with contesting a proceeding seeking his disbarment which finally resulted in a 1-year suspension of his license to practice law is deductible. (3) Whether an expenditure by G. A. Buder in the amount of $3,548.32 representing expenses assessed by the Court in a lawsuit involving ownership of certain stock is deductible. (4) Whether G. A. Buder realized additional income of $25,000 in 1953 by reason of collecting a judgment by offsetting such judgment against a liability due the judgment debtor. (5) Whether an expenditure by G. A. Buder of $800.95, representing the cost of Federal stock transfer taxes is deductible. Findings of Fact Some of the facts have been stipulated and are found accordingly. G. A. Buder, deceased, resided in St. Louis, Missouri, at all times material hereto prior to April 14, 1954. On April 14, 1954, G. *275 A. Buder died. On or about April 29, 1954, G. A. Buder, Jr., was appointed executor of the estate of G. A. Buder. G. A. Buder (hereinafter referred to as decedent) filed individual Federal income tax returns for the taxable years 1952 and 1953 with the district director of internal revenue at St. Louis, Missouri. His Federal income tax return for the period January 1, 1954, to April 14, 1954, was filed with the district director of internal revenue at St. Louis, Missouri by the executor of his estate. Federal income tax returns for the estate of G. A. Buder for the taxable period beginning April 15, 1954, and ending December 31, 1954, and for the taxable year 1955 were filed with the district director of internal revenue at St. Louis, Missouri by the executor of the estate. The individual Federal income tax returns of decedent and the returns for the estate of G. A. Buder were prepared and filed on the cash receipts and disbursements method of accounting. At all times material hereto, decedent, either alone or in conjunction with his wife, his son, G. A. Buder, Jr., or his immediate family, owned all the outstanding capital stock of Arc Realty Company, Arcadia Realty Company, *276 Lydiade Investment Trust, and Pontiac Realty Company. In addition, at all times subsequent to January 1, 1935, decedent, G. A. Buder, Jr., and Lydiade Investment Trust controlled, by reason of stock ownership, Arcadia Refining Company. During the year 1919 and for many years prior thereto, decedent and his brother, Leo R. Buder, each owned 46 percent of the common stock of Arcadia Timber Company, a Missouri corporation. At the time of his death on April 14, 1954, and for a number of years prior thereto, decedent and his brother, Oscar E. Buder, each owned one-half of the outstanding capital stock of Acreage Realty Company, a Missouri corporation. In 1908 decedent and Oscar E. Buder (hereinafter referred to as Oscar) formed a partnership under the firm name of Buder & Buder for the practice of law. Although no written articles of partnership were ever executed, decedent and Oscar practiced law under the firm name of Buder & Buder from 1908 to January 1, 1946, on which date Oscar formally dissolved the partnership. The firm of Buder & Buder maintained the books and records of Arcadia Timber Company and Acreage Realty Company and all receipts and disbursements of both companies *277 were made through the bank account of Buder & Buder. The general ledger and accounting journals of Buder & Buder also reflect some of the receipts of corporate income of Lydiade Investment Trust, Pontiac Realty Company and Arc Realty Company. In addition, Arcadia Refining Company had an account on the books of Buder & Buder. On January 2, 1946, Oscar filed a petition in the Circuit Court of the City of St. Louis, Missouri, in which decedent and the First National Bank in St. Louis, a corporation, were named as defendants. In the petition Oscar alleged generally that decedent had failed to return to Oscar or to the partnership various assets decedent had borrowed from both, and also that decedent had caused the partnership's books to show incorrect entries. By the pleading Oscar stated the partnership to be terminated and requested an accounting of its affairs. The case was given Docket No. 93848-C by which designation it will be hereinafter referred to. On April 10, 1946, decedent filed an answer in Docket No. 93848-C in which he entered a general denial to the substantive allegations of the petition. On June 6, 1952, Oscar filed a second amended petition in Docket No. 93848-C *278 wherein he alleged in substance, in the paragraphs designated, as follows: (4) That decedent has failed to account for $96,500 in bonds of the Evens and Howard Firebrick Company and for $59,000 in proceeds from the redemption of other bonds, all borrowed from Oscar by decedent for his own use on or prior to October 9, 1930. (5) That in about November 1935, decedent pledged to defendant the First National Bank in St. Louis as collateral for a loan to decedent or to Pontiac Realty Company (a corporation owned by decedent) the $96,500 of Evens and Howard Fire-brick Company bonds belonging to Oscar, that decedent's loan was also secured by various notes of Acreage Realty Company (a corporation owned equally by Oscar and decedent), that decedent has not stated by what authority he pledged such collaterals, and that defendant bank should be required to marshal the assets securing the loan and exhaust all collateral belonging to decedent or Pontiac Realty Co. before resorting to Oscar's property. (6) That Oscar is the owner of 2,412 shares of General Refractories Company stock which decedent received in exchange for the $96,500 Evens and Howard Fire-brick Company bonds and Oscar is *279 entitled to the stock with dividends thereon since May 1, 1936, and interest at 6 percent on the dividends. (7) That prior to December 12, 1936, Oscar requested decedent to sell 2,000 of the 2,412 shares of General Refractories stock when the market price was $60 per share and that decedent failed to do so and is liable to Oscar for the amount that a sale would have brought on that date with interest at 6 percent. (8) That decedent owes Oscar $23,401.34 with interest at 6 percent from November 8, 1935, resulting from decedent's failure to give Oscar proper credit on payments made by the latter on a consolidated debt owned by the two to the Mercantile Bank & Trust Company. (9) That Oscar pledged with the Mercantile Bank & Trust Company, in addition to other collateral, 20,000 shares of Burroughs Adding Machine stock and 1,500 shares of General Refractories stock, and that on October 12, 1935, decedent received from this bank a certificate for 800 shares of General Refractories stock which decedent has failed to return to Oscar. (10) That decedent has failed to account for 1,300 shares of Burroughs stock with dividends thereon from December 4, 1933, and that decedent is entitled *280 to an offsetting credit of $9,333.33. (11) That decedent has failed to distribute to Oscar, Oscar's share in the estate of Susan R. Buder, which share consists of $20,639.85 principal and $31,771.44 of accrued interest. (12) That partnership accounts, Clients' Accounts Receivable and Credit Balances Due Clients, have not been properly maintained with the result that actual accounts receivable and payable will probably never be received or paid; therefore, such accounts should be closed and charged one-half to each of the partners with certain exceptions, and that consequently decedent owes the partnership $241,874.51 and the partnership owes Oscar $241,874.51, with interest at 6 percent from January 1, 1946. (13) That decedent improperly charged Oscar's cash collection account on the partnership's books with the purchase of a $25,000 loan which is worthless; therefore, decedent owes Oscar $25,000 with 6 percent interest from January 1, 1946. (14) That decedent wrongfully removed a $75,000 credit from Oscar's cash collection account on the partnership's books; therefore, decedent is indebted to Oscar for $75,000 with 6 percent interest from January 1, 1946. (15) That decedent *281 wrongfully removed $70,000 from a partnership income account and, as a result, decedent is indebted to Oscar for $35,000 with 6 percent interest from January 1, 1946. (16) That the balance due the partnership from decedent for fees earned is $13,204.57; therefore, Oscar is entitled to one-half such sum, $6,602.28, with 6 percent interest from January 1, 1946. (17) That decedent hypothecated a $30,000 note belonging to the partnership as collateral for a loan to Pontiac Realty, that decedent has failed to account for the proceeds of the note, being 1,715 shares of Burroughs stock and $2,237.50 paid as interest; therefore, Oscar is entitled to one-half of each item with dividends on the stock and 6 percent interest on the interest payment from the date of receipt. (18) That decedent improperly caused the partnership's books to show a debt of $3,951.85 owing by one Herman Becker, that said sum is actually owed by decedent; therefore, Oscar is entitled to $1,975.92 with 6 percent interest from January 1, 1946. (19) That decedent improperly caused the partnership's books to show a $7,694.25 charge to the account of William E. Buder, that this sum represents an amount decedent loaned *282 to a corporation owned by himself; therefore, decedent owes Oscar $3,847.12 with 6 percent interest from January 1, 1946. (20) That decedent improperly charged against the partnership a personal expense of $14,283.55; therefore, decedent is indebted to Oscar for $7,141.77 with 6 percent interest from January 1, 1946. (21) That decedent was using for his own purposes $261,372.82 of the partnership's funds, and that decedent must account for the profits arising out of the use of this money; therefore, decedent is indebted to Oscar for one-half of the profits with 6 percent interest thereon from January 1, 1946. (22) That it has been necessary for Oscar to keep separate accounting of his partnership's affairs since October 1941, and Oscar files herewith a true account of his cash collections and disbursements and asks the Court to approve of same. (23) That Oscar is the equitable owner of 12,100 shares of common and one-half of the preferred stock of the Arcadia Refining Company now held by decedent or his nominees, which stock was acquired with partnership funds. (24, 25, and 26) That unless satisfactory arrangements can be made for free access of the partnership's books, the *283 handling of partnership mail, and collection and handling of partnership accounts receivable the Court will have to appoint a custodian or receiver. Decedent filed an answer and counterclaim to the second amended petition on October 14, 1952. In this pleading decedent admitted the allegations in paragraphs 19 and 20 of the second amended petition and denied all the other substantive allegations and as further defenses alleged as follows (the numbers correspond to the numbers in the pleading): (16) Decedent is entitled to retain or be credited with fees earned by him as executor for the estates of Jacob Stocke and Sophie Franz in the amounts of $5,993.72 and $43,069.95 inasmuch as the two partners had agreed that each would retain or receive credit for executor's fees earned by the individual partner. (23) Oscar is guilty of laches so as to prevent him from claiming ownership of any of the Arcadia Refining stock because Oscar failed to claim ownership or institute legal suit to establish ownership to any of the stock prior to the present suit. In addition decedent asserted as counterclaims the following (the numbers correspond with the pleading): Count 1 Decedent has made *284 payments in excess of $122,964.60 for the benefit of Oscar in reduction of Oscar's portion of a joint indebtedness owed by Oscar and decedent to the Mercantile Commerce Bank & Trust Company; therefore, Oscar is indebted to decedent in the aforementioned sum with interest at 6 percent from the dates of payment. Count 2 Oscar owes decedent $25,000 with 6 percent interest from April 8, 1920, on a loan made by decedent to Oscar. Count 3 Oscar owes decedent $1,992.88 with 6 percent interest from June 29, 1928, on a payment made by decedent to Arcadia Timber Company on Oscar's behalf. Count 4 (1) Decedent made payments of $124,900 on a debt owed by the partnership to the estate of Sophie Franz for which decedent has not received credit on the partnership's books. (2) Decedent paid a $70,000 indebtedness owed by Acreage Realty Co. to Mercantile Commerce Bank & Trust Co., and, consequently, because Acreage Realty is owned by the partnership the latter is indebted to decedent in the aforementioned amount. (3) Acreage Realty has paid off an indebtedness of $100,000 owed by it to Oscar, and, as a consequence, such payment should be reflected on the records of Acreage Realty, *285 which are contained in the accounts of this company on the books of Buder & Buder. (4) Oscar is indebted to the partnership in the amount of $80,707.06 on an open account. (5) Oscar wrongfully took credit on the partnership's books for the amounts of $16,058.15 representing a payment by Oscar on behalf of the Arcadia Timber Company by reason of the fact that Oscar had previously been given credit for such payment. (6) Oscar owes the partnership $26,041.66 representing partnership's funds used by Oscar for his own personal investments. (7) Decedent is entitled to a credit on the partnership's books for $225,239.12 representing the proceeds from the sale of collateral put up by decedent on a partnership indebtedness, to be offset by a $75,000 disbursement made by the partnership to decedent which was not recorded on the partnership's books. Also, Oscar should account for $10,239.12 received by him from the creditor out of the proceeds from the sale of collateral put up by decedent to secure the loan. (8) Decedent is the only party interested in the "Lydia D. Buder" account which appears on the partnership's books and is entitled to the balance of $47,471.50. (9) and (14) *286 Decedent is the only party interested in the "Burroughs Syndicate" account which appears on the partnership's books and is entitled to the balance therein, as corrected, of $62,456.57, as well as $50,000 which Acreage Realty owes to this account. (10) The partnership is indebted to decedent by reason of a $5,000 loan made to Acreage Realty by Lydia D. Buder. (11) Decedent's account in the partnership was improperly charged with the sum of $2,750, representing interest payments on a loan. (12) Decedent is entitled to credit for payments of $11,761.74 made to the partnership on decedent's mistaken assumption that he owed interest on amounts borrowed by decedent from the partnership. (13) Oscar should be charged on the partnership's books with $63,462.20 representing the debit balance in a partnership account entitled, "Evens & Howard Sewer Pipe Company" resulting from personal transactions of Oscar. (15) Oscar should be charged on the partnership's books with $1,157 representing a payment on his behalf by Acreage Realty to an insurance company. All proceedings in Docket No. 93848-C during the years in issue were under the second amended petition. Oscar joined the First *287 National Bank in St. Louis as a defendant in Docket No. 93848-C in order to assert his interest in certain property held as collateral on a loan of the bank to Pontiac Realty Company. This loan to Pontiac Realty Company was subsequently paid in full. Thereafter, the parties involved in Docket No. 93848-C, through their respective attorneys, executed on or about October 24, 1954, a stipulation to the effect that the above-mentioned collateral was to be deposited in the registry of the Court for determination of the claimed interests of the parties therein. On March 26, 1951, and April 27, 1951, Oscar filed certain motions in Docket No. 93848-C requesting decedent to produce the books and records of Arcadia Refining Company. These motions related to a contention by Oscar that he was the owner of 12,100 shares of common stock in Arcadia Refining Company and one-half of the preferred stock. On December 17, 1954, Oscar issued a supplemental petition to second amended petition wherein he joined G. A. Buder, Jr., Pontiac Realty Company, Arcadia Timber Company, and Lydiade Investment Trust as defendants in Docket No. 93848-C. Oscar therein alleged generally that the defendants held assets *288 belonging to the partnership. On January 19, 1955, petitioner filed a motion in Docket No. 93848-C requesting that Acreage Realty Company be joined as a party defendant. During the taxable years 1952 and 1953 and the taxable period beginning January 1, 1954, and ending April 14, 1954, decedent paid legal fees and incidental expenses in connection with Docket No. 93848-C in the aggregate amount of $10,458.20, [1] $39,379.14, and $11,591.50, respectively and for the period beginning April 15, 1954, and ending December 31, 1954, and the taxable year 1955, petitioner paid legal fees and incidental expenses in connection with Docket No. 93848-C for services rendered during those periods in the aggregate amounts of $46,248.71 and $68,477.69, respectively. Included in the above expenses are amounts paid to Olga Becker, an attorney, and to Peat, Marwick, Mitchell & Co., an accounting firm, for services which include searching and analyzing the files and records of the various corporate enterprises *289 in which the two partners, either separately or jointly, were interested. Of the expenses incurred by decedent and petitioner relative to Docket No. 93848-C, 25 percent relate to issues with respect to personal transactions between Oscar and decedent and 10 percent relate to defense of title to the Arcadia Refining Company stock. In 1947 the Advisory Committee of the Missouri bar instituted a proceeding against decedent and Oscar seeking to disbar them by filing an Information in the Supreme Court of Missouri. A special Commissioner was appointed by the Supreme Court to hear the evidence, and hearings were held before him. Decedent was represented in such proceedings by Taylor Sandison, a St. Louis attorney. The proceeding terminated in 1949 with the rendition of the Supreme Court's opinion entitled, "In re Buder, et al, No. 40277" 217 S.W. 2d 563, wherein the Court ordered decedent's license to practice law in the State of Missouri suspended for 1 year. Sandison died in 1950 without having been fully compensated for his services in connection with this proceeding. This liability was settled in 1952 by decedent's paying the sum of $4,250 to Sandison's estate. In *290 1943, the Star-Times Publishing Company filed an interpleader action against Eugenia H. Buder, as trustee and others, and decedent and another, for a declaratory judgment respecting ownership of 385 shares of second preferred stock of the Star-Times Publishing Company. The stock stood in the name of Eugenia H. Buder, trustee, but there was no specific designation for whose benefit the trust existed. Decedent, owner of a 50 percent interest in the Acreage Realty Company, maintained that the trust was for the benefit of Acreage Realty Company. The other 50 percent interest in the Acreage Realty Company was owned by Oscar, husband of Eugenia H. Buder, who maintained that the trust was for the benefit of his children. On or about August 21, 1950, the Circuit Court of the City of St. Louis entered a judgment and decree in such interpleader suit to the effect that the record failed to establish a trust for either Oscar's children or for Acreage Realty Company and that a resulting trust existed for the benefit of American Press creditors. The decree provided that new stock certificate be issued for the 385 shares in the names of and delivered to, and that the impounded dividends be paid to, *291 the surviving members of the last board of directors of the defunct American Press, in trust for the benefit of Acreage Realty Company and such other American Press creditors who shall establish a legally enforceable and valid claim against the American Press. An appeal was taken to the Missouri Supreme Court which reversed the lower court, holding that the stock was held by Eugenia H. Buder in trust for Oscar's children. In 1953 decedent paid $3,548.32 assessed against him by the Court as attorneys' fees, accounting fees, and court costs in this interpleader action. On or about July 15, 1953, decedent and Oscar, as the partners constituting the former law firm of Buder & Buder, recovered a judgment for the sum of $50,000 against the estate of Sophie Franz, deceased, for legal services rendered to her during her lifetime. Decedent, one of the claimants, was also the executor of the estate of Sophie Franz, deceased, which estate was pending in the Probate Court of the City of St. Louis, Missouri. The books of Buder & Buder showed the firm to be indebted to the estate of Sophie Franz in the amount of $57,676.47. In the final settlement which decedent filed as the executor of the *292 estate of Sophie Franz, deceased, in October 1953, he offset the $50,000 judgment against the amount shown by the books of Buder & Buder to be due the estate of Sophie Franz from that firm. Oscar objected to this offset and instituted proceedings in the Probate Court of St. Louis seeking to have the action of the executor disapproved and vitiated. This proceeding was heard, and a decision rendered by the Probate Court approving the actions of decedent. An appeal from the order and judgment of the Probate Court has been taken and affirmed by the Circuit Court of the City of St. Louis. The time for appealing from the decision of the Circuit Court had not expired at the time of trial of the present case. During' the taxable year 1953, decedent had loans from 37 banks in the total sum of approximately $1,550,000. With two exceptions (The National Stock Yards National Bank at National Stock Yards, Illinois and Commerce-Warren County Bank at Warrenton, Missouri) these loans were placed in his behalf by either Shearson-Hammill of Chicago, Illinois or St. Louis Live Stock Loan Company of St. Louis, Missouri. As security for the payment of these loans, decedent pledged or hypothecated numerous *293 corporate securities. During the taxable year 1953, decedent paid Federal stock transfer taxes in the amount of $800.95 in connection with the transfer of various securities which had been deposited as collateral security on the above-mentioned loans of decedent. While so pledged such securities had been registered in the names of others than the actual owners and these transfer taxes were paid in connection with transfer to the names of the actual owners. During 1952 decedent made purchases for his own account through brokers of shares of stock of 11 different corporations ranging in amounts from 150 shares to 2,000 shares and bonds of one corporation, the total cost of these stocks and bonds being $126,645.30, and made sales for his own account through brokers of stocks of 14 different corporations ranging in amounts from 100 to 3,000 shares and sales of bonds of one corporation, the total proceeds of these transactions being $195,000.39. During the taxable year 1953 decedent made purchases, for his own account through brokers, of stocks of nine different corporations in amounts from 54 to 1,500 shares, the total cost of these stocks being $149,027.07, and made sales, for his *294 own account through brokers, of stocks of ten different corporations ranging in amounts from 100 to 2,000 shares and bonds of one corporation, the total proceeds of these transactions being $106,860.17. Decedent, on his income tax returns for the years 1952, 1953, and the period January 1, to April 14, 1954, claimed deductions in the amounts of $11,298.20, $39,379.14, and $11,591.50, respectively, for attorneys' fees and other expenses paid in connection with Docket No. 93848-C. Petitioner, on its income tax returns for the period April 15 to December 31, 1954, and the year 1955 claimed deductions in the amounts of $46,248.71 and $68,477.69, respectively, as expenses in connection with Docket No. 93848-C. Respondent in his notices of deficiency disallowed these amounts with the explanation in each instance that it had not been established that such expenses represented an ordinary and necessary business expense, or an expense in connection with the production or collection of income or for the management, conservation or maintenance of property held for the production of income. Decedent on his income tax return for 1952 claimed as a deduction the amount of $4,250 paid to the *295 estate of Taylor Sandison for services in connection with the disbarment proceeding, and respondent in his notice of deficiency disallowed this claimed deduction with the explanation that it had not been established that such expense represented an ordinary and necessary business expense, or an expense in connection with the production or collection of income or for the management, conservation or maintenance of property held for the production of income. Respondent increased decedent's income as reported in the year 1953 by including therein $25,000 with the explanation that the partnership of Buder & Buder received a payment of $50,000 from the estate of Sophie Franz, and the decedent received $25,000 of the fee but failed to report the amount on his income tax return. Decedent on his income tax return for 1953 deducted $3,548.32 as court costs in connection with the case of Star-Times Publishing Company. Respondent in his notice of deficiency disallowed the claimed deduction with the explanation that it had not been established that such expense represented an ordinary and necessary business expense, or an expense incurred in connection with the production or collection of income *296 or for the management, conservation or maintenance of property held for the production of income. Petitioner, in its amended petition, alleged that respondent erred in not allowing as an additional deduction the amount of $958.45 (now recognized to be only $800.95) paid by decedent in 1953 as stock transfer taxes on stocks which had been placed in "street name" incident to its use as collateral to secure loans. Numerous other adjustments made by respondent in the notices of deficiency to which errors were assigned in the petition have been disposed of by agreement of the parties. Opinion During the years 1952 to 1955, inclusive, a total of $176,595.24 was paid primarily in legal and accounting fees by decedent and petitioner in a legal action brought by Oscar Buder against decedent. The action brought by Oscar was to dissolve the partnership and generally for an accounting of the assets and income of the partnership and for individual loans made by Oscar to decedent. Decedent in his answer and counterclaim denied most of Oscar's allegations and affirmatively alleged generally that Oscar was indebted to decedent in various amounts on loans made to Oscar by decedent, and further *297 requested that the Court have the partnership's books accurately reflect the numerous payments to or on behalf of the partnership and withdrawals from the partnership by the two partners. Petitioner contends that all of the expenses incurred are deductible either under sections 23(a)(1) or 23(a)(2) of the Internal Revenue Code of 1939, or sections 162(a) or 212(1) or ( 2) of the Internal Revenue Code of 1954. Respondent contends that the issues present in the litigation with respect to which these fees were paid can be broken down into four categories, namely, personal claims, claims relating to the various corporations owned by the partners, defense of title to stock, and an accounting for the affairs of the partnership. Respondent argues that the expenses relating to personal issues are not deductible at all, that to the extent the claims involve income or liabilities of the several corporations, the expenses relative thereto are not deductible by decedent or petitioner under the rationale of Deputy v. du Pont, 308 U.S. 488 (1940), and that the expenses with respect to Oscar's claim to the Arcadia Refining Co. stock were paid in defense of title *298 to property and must be capitalized. Respondent agrees that the expenses paid with respect to those issues relating to an accounting of the partnership's affairs are deductible under Kornhauser v. United States, 276 U.S. 145 (1928), but contends that the burden is on petitioner to show the amount of the expenses allocable to the partnership accounting. Oscar and decedent started the practice of law together in 1908. Their activities extended beyond the usual practice of law. They performed quasi banking functions for their clients and as between themselves they engaged in numerous investments. From the pleadings in Docket No. 93848-C it appears partnership assets were invested in various corporate enterprises, that these corporate enterprises had open accounts on the partnership's books, and in the case of Acreage Realty the partnership maintained all the bookkeeping for that company. It also appears that Oscar and decedent made personal loans to each other or paid personal obligations of the other which in no way were related to the activities of the partnership. We will discuss in order the four categories of claims respondent contends are involved in Docket No. *299 93848-C. The first category is those issues arising out of personal transactions. Respondent contends that at least twelve separate paragraphs or counts in either the second amended petition or the answer and counterclaim to the second amended petition relate to personal matters. These are paragraphs 4 through 11 and 17 of the second amended petition, and counts 1, 2 and 3 in the answer to the second amended petition. In addition respondent asserts that of the fifteen paragraphs in count 4 of the answer to the second amended petition, seven paragraphs involve either personal transactions between the two partners or matters relating to one or more of the corporations in which they were interested, and the other eight paragraphs involve either partnership matters or mixed partnership and personal transactions. The principal attorney who represented decedent and petitioner in Docket No. 93848-C testified as a witness for petitioner, He identified certain issues which he stated were personal issues between Oscar and decedent. The issues which he identified as personal appear to include paragraphs 4 through 9, 11 and 17 of the second amended petition and counts 1, 2 and 3 of the answer. *300 Paragraph 10 of the second amended petition relates to a claim by Oscar for the return of 1,300 shares of Burrough's Adding Machine stock with dividends thereon from December 4, 1933, which stock decedent had used as collateral for a loan. The record does not afford any explanation for the loan or show that the loan arose from anything other than a personal transaction. The paragraphs contained in count 4 of the answer to the second amended petition, we feel, relate to the affairs either of the partnership or to one of the corporations in which the partners were interested and not to personal claims. As to the paragraphs respondent has denominated as mixed partnership and personal transactions, the pleadings themselves involve the partnership, in the usual instance decedent is asserting either that Oscar should be charged or decedent credited with certain amounts on the partnership's books. The effect of the testimony of the only witness who testified as to the nature of the issues in Docket No. 93848-C was that the issues in count 4 of decedent's answer to the second amended petition related to partnership matters. We hold accordingly. The second category is those paragraphs which *301 respondent argues relate to the various corporations in which the parties had an interest. Respondent argues that expenditures for the benefit of the corporations are not ordinary and necessary business or nonbusiness expenses of either decedent or petitioner. Respondent specifies paragraphs 2, 3, 5, 10, 14, and 15 of count 4 of the answer to the second amended petition as containing such corporate issues. An examination of the above-numbered paragraphs reveals that although a corporation was in some way involved, it was not a claim belonging to or against the corporation, as such, that was being asserted, but rather, it was a claim to have the partnership's books properly reflect a transaction involving the partners and the corporations. In the usual instance decedent claimed to have made payment to or on behalf of a corporation, and for this he wanted to receivd credit on the partnership's books. In one paragraph decedent alleged that Acreage Realty Company had paid off a $100,000 debt to Oscar and, therefore, such payment should be reflected on Acreage's account on the partnership's books. Decedent and Oscar maintained accounts on the partnership's books on which they would be *302 credited for payments made by them to or on behalf of the various corporations and on which they would be charged for payments by the corporations on their behalf. These accounts were he method by which they determined their respective interests in the corporation. The paragraphs specified by respondent represent attempts at having these individual accounts made accurate. As such these paragraphs would constitute an integral part of the accounting of the partnership's affairs. The expenses relative to these issues are deductible. The supplemental petition to the second amended petition filed in December 1954 did raise certain issues that involved claims of or against certain corporations but the evidence is clear that none of the expenses deducted for the years here involved was for work in connection with those claims. The next category relates to Oscar's assertion that he is the owner of 12,100 shares of the common stock of Arcadia Refining Company and one-half of that corporation's preferred stock, held by decedent or his nominees. Decedent has denied the allegations and raised the defense that Oscar was guilty of laches because he failed to claim ownership to the stock or institute *303 legal action prior to January 2, 1946. Respondent's position with respect to this category is that decedent was defending or perfecting his title to the Arcadia stock within the holdings of Addison v. Commissioner, 177 F. 2d 521 (C.A. 8, 1949), affirming a Memorandum Opinion of this Court, and Brown v. Commissioner, 215 F. 2d 697 (C.A. 5, 1954), affirming on issue of legal expenses and reversing on another issue 19 T.C. 87 (1952). Petitioner contends that the mere fact that the title to property happened to be incidentally involved in litigation does not render the expenses incurred therein nondeductible unless the primary purpose of the litigation was to perfect or defend title. Petitioner cites Industrial Aggregate Company v. United States, 284 F. 2d 639 (C.A. 8, 1960); Baer v. Commissioner, 196 F. 2d 646 (C.A. 8, 1952) [2]; and Hochschild v. Commissioner, 161 F. 2d 817 (C.A. 2, 1947). The Arcadia *304 stock, according to Oscar's pleadings in Docket No. 93848-C was acquired by the partnership as a consequence of loans made by the partnership to a predecessor corporation. According to Oscar the Arcadia stock was issued in straw names and is now held in the name of either decedent or his nominees. Oscar here is asserting ownership to particular stock held in the names of decedent or his nominees. Decedent by denying Oscar's allegations and raising the affirmative defense of laches is defending or perfecting his title to the stock. It is true that the claim arose out of a business transaction but still title to property is being defended or perfected. There is no allegation that the Arcadia stock was acquired from earnings of the partnership. Although the establishment of the rightful ownership of the Arcadia stock may be an integral part of unravelling the partnership's affairs, nevertheless, the claim pertains to an item separate from the other claims and relates specifically to the establishment of title to property. The cases cited by petitioner are distinguishable. In both Industrial Aggregate Company v. United States, supra, and Hochschild v. Commissioner, supra, *305 the claim for title to property was secondary to a claim for damages arising from misuse of property or mismanagement of a corporate enterprise. In Baer v. Commissioner, supra, the legal fees were incurred in arranging for the payment of a marriage settlement and not in contesting title to specific property. Petitioner has cited numerous other cases to the effect that expenses incurred either for the collection or production of income, or for the management, conservation, or maintenance of property held for the production of income are deductible. None of these cases held that expenses arising out of personal transaction are deductible or that amounts expended in establishing title to property are not capital in nature but are deductible as ordinary and necessary business expenses. Petitioner does not contend that the personal transactions between Oscar and decedent were in any way connected with their business relationships in the partnership, the enterprises related thereto, or other profit-seeking transaction. It is rather petitioner's contention that expenses relating to these personal transactions between the brothers were so small a portion of the total expenditures *306 in connection with Docket No. 93848-C, that the entire amount of the expenditures should be deductible. The evidence as a whole does not sustain petitioner's contention. Under the recent decision of the Supreme Court in United States v. Gilmore, - U.S. - (February 18, 1963) "the characterization as 'business' or 'personal' of litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities." We must therefore determine what portion of the litigation expenses here involved was related to claims which did not arise in connection with decedent's profit-seeking activities. The principal attorney representing decedent and petitioner in Docket No. 93848-C estimated that only approximately 10 percent of his and his associates' time in connection with Docket No. 93848-C was spent on issues arising from personal transactions between Oscar and decedent. However, in making this estimate it appears that he did not give consideration to all the issues which are personal. Also, the fees of these attorneys constitute less than half *307 of the total claimed deductions. We recognize that the evidence in this case does not permit of a determination with exactitude of the portion of the payments allocable to the personal issues or the issue with respect to the defense of title to the Arcadia Oil stock. However, the money amounts of the claims, some of the statements upon which payments were made to the accounting firm and Olga Becker and some of the time cards' analysis of the time expended by the attorneys are in the record. Considering the evidence as a whole our best estimate is that 25 percent of the expenses in each year was with respect to the personal issues and 10 percent with respect to the defense of title to the Arcadia Oil stock and the remaining 65 percent with respect to the partnership accounting issue. In determining the portion of the expenses applicable to defending or prosecuting personal issues, we have eliminated interest claims related to such personal issues on the theory that such interest, if recovered, would have constituted income to decedent or would constitute income to petitioner, the expenses of the collection of which would be deductible. Cf. Pennroad Corporation, 21 T.C. 1087 (1954), *308 aff'd. 228 F. 2d 329 (C.A. 3, 1954). Petitioner argues that to the extent the legal fees and expenses were for services rendered to the estate they would be deductible under the holdings of Commissioner v. Goldberger's Estate, 213 F. 2d 78 (C.A. 3, 1954), reversing on another issue 18 T.C. 1233 (1952) and Loyd v. United States, 139 Ct. Cl. 626, 153 F. Supp. 416 (1957) irrespective of whether they related to issues involving personal transactions between Oscar and decedent or expenses in connection with defense of title to the Arcadia Oil stock. We agree with petitioner that amounts paid by the estate for services to the executor in connection with Docket No. 93848-C are deductible insofar as they are ordinary and necessary expenses in connection with the duties of administration. In fact, respondent's regulations specifically so provide.[3] Certainly the defense of a claim of any nature against the estate which the executor considers unwarranted even though its origin was from a nonbusiness transaction of the decedent and the prosecution of personal claims of the decedent is the duty of the executor in connection with the *309 administration of the estate and the expenses of such defense and prosecution are ordinary and necessary expenses in connection with the administration of the estate. Commissioner v. Goldberger's Estate, supra, and Loyd v. United States, supra.Cf. Trust of Bingham v. Commissioner, 325 U.S. 365 (1945). Petitioner has pointed to no cases which hold that legal expenses *310 of an estate in defending its title to property may be deducted as ordinary and necessary business expenses. Lloyd v. United States, supra, upon which petitioner principally relies recognizes, for the purposes of the decision therein, that in the case of a fiduciary "if the primary purpose of the litigation which gave rise to the expense was title, then the expenditure is capital in nature and must be capitalized." Cf. Brown v. Commissioner, supra.
Respondent argues that the evidence does not show that all the expenses paid by petitioner for the taxable period April 15, 1954, to December 31, 1954, and the taxable year 1955 were expenses for services rendered after decedent's death to the executor cutor. We think the evidence is clear that the payments by petitioner were for services rendered after decedent's death. Although a claim against the estate was filed with the Probate Court by the attorneys for additional compensation for services rendered to decedent, this claim was not filed until 1955 and the amount of payments made to the attorneys by petitioner coincides exactly with their claims for services to the executor. The bills for the accounting services and *311 services of Olga Becker for periods prior to decedent's death show that they were paid by decedent during his lifetime. We hold that 65 percent of the litigation expenses in respect to Docket No. 93848-C paid by decedent for the years 1952, 1953 and the period January 1 to April 14, 1954 is properly deductible and sustain respondent's disallowance of the claimed deduction to the extent of 35 percent thereof and that 90 percent of the similar expenses paid by petitioner for the period April 15 to December 31, 1954 and the year 1955 is properly deductible and sustain respondent's disallowance to the extent of 10 percent of such expenses. In 1952 decedent paid $4,250 as attorneys' fees relative to a disbarment proceeding brought against him by the Advisory Committee of the Missouri Bar. There were five counts of ethical misconduct brought against decedent. Four were sustained by the Supreme Court of Missouri and the fifth count was dismissed with an admonition and reprimand to decedent for his actvities set forth therein. Decedent's license to practice law was suspended for 1 year. The general rule is that *312 legal expenses incurred in the unsuccessful defense of a criminal proceeding are not deductible. Thomas A. Joseph, 26 T.C. 562 (1956) and the cases cited therein. The rule is one of public policy. Petitioner argues that here the proceedings were not criminal and that, in any event, decedent was not disbarred. The proceedings for disbarment are sufficiently close to a criminal proceeding that analogous reasoning as to public policy applies. The fact that decedent had his license to practice law suspended for 1 year rather than being disbarred goes only to the amount of punishment meted out to him. It does not show that he successfully defended the charges brought against him. In fact four of the five counts brought against decedent were sustained. Certainly the unethical conduct which the Supreme Court of Missouri found petitioner to have indulged in was not ordinary and necessary but rather was extraordinary and unnecessary. Since it was this conduct which gave rise to the expenditure of the legal fees, these fees are not deductible. Cf. Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30 (1958). *313 Petitioner relies heavily on Commissioner v. Heininger, 320 U.S. 467 (1943). In Heininger the taxpayer incurred legal expenses in defending against a proposed mail fraud order before the Postmaster General and in securing a court injunction. Ultimately, he was unsuccessful and was denied the use of the mails. The Court held the legal expenses incurred to be deductible stating that they were ordinary and necessary to taxpayer's dental mail-order business. The Court further stated that the allowance of deduction for such expenses would not frustrate sharply defined public policy, that the intent of the statute was to protect the public from fraudulent practices committed through the use of the mails and not to impose personal punishment on the violators. See Thomas A. Joseph, supra, and Anthony Carnero Stralla, 9 T.C. 801 (1947). The purpose of the disbarment proceeding in the present case was clearly a personal disciplinary measure taken against decedent. Although a secondary effect of such measures may be to assure to the public higher ethical practices on the part of practicing attorneys in the State of Missouri, the main purpose was to *314 discipline attorneys for their transgressions. As such, to allow deduction of attorney's fees relative to this proceeding would frustrate sharply defined public policy. We sustain respondent in his disallowance of the claimed deduction. In 1953 decedent paid $3,548.32 as court costs assessed against him in an interpleader action. The interpleader action was filed by the Star-Times Publishing Company seeking a declaratory judgment to establish the ownership of 385 shares of Star-Times Publishing Company stock then held in trust. Decedent entered the action asserting that the stock was held in trust for the benefit of Acreage Realty Company. Petitioner asserts that the expenses assessed against decedent proximately relate to the business of Buder & Buder and are deductible as trade or business expenses. The rule is, however, that the trade or business of a corporation will not be imputed to its shareholder. Therefore, when a shareholder incurs an expense relative to the corporation's trade or business, the expense is not deductible by the individual shareholder. Deputy v. du Pont, supra. *315 The expenses in this case were incurred by decedent in asserting a claim on behalf of Acreage Realty, a corporation in which decedent had a stock interest. The claim relates to the trade or business of the corporation. There is no showing that the expenses related to any business activity of Buder & Buder or of decedent. Acreage Realty owned various pieces of real estate and mortgages to property. There is no evidence that Buder & Buder or decedent engaged in any real or personal property activities other than through Acreage Realty, or that if Buder & Buder or decedent did engage in such activities of their own, that these activities in any way related to the business of Acreage Realty. Nor is there any showing that Acreage Realty's activities in any other way related to the practice of law by Buder & Buder or to any activity carried on by decedent individually. The only evidence in the record showing a connection between the activities of Acreage Realty Company and Buder & Buder is an uncontested pleading in Docket No. 93848-C to the effect that decedent and Oscar were in the business of making and managing investments in both real and personal property and that incidental *316 to this business Acreage Realty was formed. There also was testimony that Acreage Realty was considered an "arm" of Buder & Buder. However, as stated above, there is no showing what investment activities the law partnership carried on other than through the corporation. The only connection between the businesses of the partnership and the corporation suggested by petitioner on brief is that Acreage Realty acted as a repository where Oscar and decedent placed the earnings from the law partnership Apparently this was the manner in which the two partners chose to invest the profits arising from their law practice. This connection does not suffice to support deduction of the claimed expense. The cases cited by petitioner, Cubbedge Snow, 31 T.C. 585 (1958); Charles J. Dinardo, 22 T.C. 430 (1954) and E. L. Potter, 20 B.T.A. 252 (1930) are distinguishable on the ground that although the expenditures were by shareholders and were of benefit to their respective corporations, the expenditures were closely related to a trade or business carried on by the shareholders independent of the corporation. Thus, in Snow the payments to support a savings and *317 loan association proximately related to the title abstract business carried on by taxpayers as lawyers. In Dinardo the payments to maintain a hospital corporation whose hospital was used by patients of taxpayers proximately related to taxpayers' medical practice. In Potter legal fees paid by taxpayer in defending a lawsuit against his hotel corporation seeking mortgage foreclosure, an accounting, and removal of taxpayer from control, proximately related to taxpayer's trade or business of financing and managing hotels. In the instant case there has been no showing of any relationship between decedent and Acreage Realty which caused petitioner to intervene in the suit except his relationship to the corporation as stockholder. We sustain respondent's disallowance of this claimed deduction. The next issue relates to an amount of $25,000 added by respondent to decedent's reported income in the year 1953. In 1953 Oscar and decedent recovered a judgment of $50,000 against the estate of Sophie Franz for legal services rendered. At this time decedent was executor of the estate of Sophie Franz. The books of Buder & Buder showed the firm to be indebted to the estate of Sophie Franz in the *318 amount of $57,676.47. In the final settlement which decedent filed as executor of the estate of Sophie Franz in October 1953, he offset the $50,000 judgment due from the estate against the amount shown by the books to be due to the estate of Sophie Franz from the firm of Buder & Buder. Oscar objected to such offset and instituted proceedings in the Probate Court of St. Louis seeking to have the action of the executor disapproved. Decedent's actions respecting the offset were approved, and the judgment of the Probate Court was affirmed by the Circuit Court of the City of St. Louis. Respondent argues that the offset constituted the receipt of income by Buder & Buder and, consequently, one-half, or $25,000, is taxable to decedent. If the offset is not deemed to constitute income, respondent argues alternatively that the income was constructively received by the law firm because the judgment was due the law firm and the estate had sufficient funds to pay the judgment. The rule is that mutual debts do not on their own extinguish each other and, thereby, result in the realization of taxable *319 income. Bailey v. Commissioner, 103 F. 2d 448 (C.A. 5, 1939). However, the actual offset of an account receivable against an account payable, as here, operates as a collection of the receivable and the receipt for a cash-basis taxpayer of taxable income. Bailey v. Commissioner, supra, Cf. Clarke v. United States, 189 F. 2d 101 (C.A. 3, 1951); Acer Realty Co. v. Commissioner, 132 F. 2d 512 (C.A. 8, 1942) affirming 45 B.T.A. 333 (1941). William H. Stayton, Jr., 32 B.T.A. 940 (1935). No contention is made that the liability shown on the books of Buder & Buder due to the estate of Sophie Franz was nonexistent or that its cancellation was not of economic value to decedent. Decedent acted in a dual capacity in that as executor of the estate of Sophie Franz he authorized the offset and in his personal capacity as a claimant he is deemed to have known that the offset was made and to have consented to it. Petitioner argues that the offset was merely tentative and of no effect until it was approved by the Probate Court, which petitioner contends did not occur until the year following the offset. Assuming *320 that a payment by offset would not take effect until approved by the Probate Court, it appears such approval was forthcoming in 1953, the year in which the offset was made. The record shows that Buder & Buder recovered judgment against the Estate of Sophie Franz in July 1953. There is no question that it was a valid claim and that payment by the estate was fully authorized. In the final settlement filed by decedent as executor of the estate of Sophie Franz in October 1953 decedent offset the judgment against a debt shown on the books of Buder & Buder as owing to the estate. In December 1953, the Probate Court made an order of partial distribution from the estate, which distribution was, in fact, made. It does not seem probable that the Probate Court would authorize a distribution of estate assets had it not approved the offset. This being so, such approval must have existed in December 1953, when the distribution was authorized. There is no evidence to support petitioner's contention that approval of the Probate Court of the offset was not until 1954. Since the burden to show error in respondent's determination is on petitioner, petitioner has failed in its proof. It is apparent *321 that there would be no objection to an offset from the point of view of the estate and therefore there would be no reason for disapproval by the Probate Court. There was no question that the estate was indebted to Buder & Buder in the amount of the judgment and by use of the offset the estate could satisfy that judgment without parting with any of its tangible assets. Cf. Jacobs v. Hoey, 136 F. 2d 954 (C.A. 2, 1943). Decedent is deemed to have consented to the offset in his capacity both as executor and as claimant. It may be that Oscar can show ultimately as he contends that the liability against which the judgment was offset was no liability of his but was solely that of decedent, and that he should receive his share of the judgment in cash. This, however, would not detract from the fact that decedent had consented to the offset and admittedly received value from the cancellation of indebtedness. We sustain respondent in his addition of the $25,000 to decedent's 1953 income. The final issue relates to Federal stock transfer taxes of $800.95 paid by decedent in 1953 incident to transferring into the names of the actual owners various corporate securities which had *322 been used by decedent as collateral for numerous loans. Petitioner contends that he was in the trade or business of trading in stocks, and that the expenses incurred were ordinary and necessary to that business. The only evidence in the record to support such a contention is petitioner's purchases and sales of stocks and bonds for his own account through brokers. This evidence is insufficient to show that decedent was in the trade or business of trading in stocks. Assuming arguendo that decedent was in the trade or business of trading in stocks, there is no showing of a connection between this trade or business and the expenses incurred. According to the stipulated facts decedent had numerous bank loans and as security for the loans decedent pledged corporate securities. While so pledged, the securities had been registered in straw names and the subject transfer taxes were paid by decedent in connection with transferring the securities into the names of the actual owners. Apparently not all the stocks pledged to secure decedent's loans belonged to decedent. The record does not reveal the purpose for the loans. There is no showing that the loans related at all to decedent's trading *323 activities or to any other activities of decedent for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income. In view of this failure of proof the respondent's determination must be sustained. Other issues raised in the petition have been settled by stipulation and one issue as to an understatement by $204 of a capital gain from the sale in 1955 of Wisconsin Central Railway bonds apparently was abandoned by petitioner since no evidence was introduced and no argument was made with respect thereto. Decision will be entered under Rule 50. Footnotes
1. The stipulated expenditure was $10,858.20 which the parties agreed included $400 paid to Olga Becker with respect to decedent's income tax which respondent on brief conceded to be deductible.↩
2. See criticism of the reasoning in this case in United States v. Gilmore - U.S. - (Feb. 18, 1963).↩
3. Sec. 1.212-1(i), Income Tax Regs.
Reasonable amounts paid or incurred by the fiduciary of an estate or trust on account of administration expenses, including fiduciaries' fees and expenses of litigation, which are ordinary and necessary in connection with the performance of the duties of administration are deductible under section 212↩, notwithstanding that the estate or trust is not engaged in a trade or business, except to the extent that such expenses are allocable to the production or collection of tax-exempt income. But see sec. 642(g) and the regulations thereunder for disallowance of such deductions to an estate where such items are allowed as a deduction under section 2053 or 2054 in computing the net estate subject to the estate tax.